IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 93-1211

---

ROY B. TAYLOR SALES, INC.,

Plaintiff-Appellee,

versus

HOLLYMATIC CORPORATION,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Texas

---

(August 3, 1994)

Before GOLDBERG, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Roy B. Taylor Sales, Inc., a dealer of hamburger patty machines and patty paper, sues its supplier, Hollymatic Corporation, a manufacturer of patty products. Taylor alleges that Hollymatic violated the antitrust laws by requiring Taylor to purchase patty paper as a condition to purchasing patty machines. A Texas jury found that Hollymatic illegally tied the products in violation of § 1 of the Sherman Act[1] and § 3 of the Clayton Act,[2] that Hollymatic conspired with its paper supplier, Bomarko Corporation, to restrain trade in violation of § 2 of the Sherman

---

[1]  15 U.S.C. § 1.

[2]  15 U.S.C. § 14.

Act,[3] and that Hollymatic established or attempted to establish a monopoly in violation of § 1 of the Sherman Act.[4] The district court trebled the jury's award and entered judgment for Taylor. We find insufficient evidence of either a threat or injury to competition and reverse.

## I.

Roy B. Taylor Sales, Inc., sells and services food handling equipment and supplies. Hollymatic Corporation manufactures food processing equipment and related products, including machines for making hamburger patties and paper for handling hamburger patties. Bomarko Corporation supplies Hollymatic with paper goods to make patty paper.

Taylor began selling Hollymatic products in 1970 subject to an agreement requiring Taylor not to stock or sell the merchandise of Hollymatic's competitors. The parties forged a different agreement in 1979 requiring Taylor to make its "best efforts" to promote, sell, and service the full line of Hollymatic products. Taylor alleges that while the 1979 agreement did not formally prohibit Taylor from selling products other than Hollymatic's, Hollymatic informally maintained the requirement. Taylor claims that Hollymatic required Taylor, and other dealers and distributors, to purchase exclusively Hollymatic patty paper as a condition for the purchase of patty machines.

---

[3]  15 U.S.C. § 2.

[4]  15 U.S.C. § 1.

According to Taylor, Hollymatic and Bomarko conspired to resist a decline in patty paper prices. Taylor suggests that Hollymatic could sustain prices above the market rate for patty paper because dealers and consumers were dependent on Hollymatic for supplying and servicing its patty machines. Taylor further alleges that Hollymatic offered rebates on patty paper only to some customers. Taylor sought such rebates, but claims that it received only a slight reduction in price in one instance and that it was refused any reduction in others.[5] After selling no patty paper other than Hollymatic's for years, Taylor began in 1988 to purchase a substitute.

Hollymatic officials confronted Taylor's president, Ronnie Taylor, in 1990 about Taylor's decreased demand for Hollymatic's product. When Mr. Taylor acknowledged purchasing patty paper from another company, Hollymatic expressed an intention to end the relationship with Taylor. Taylor offered to sell only Hollymatic patty paper in the future and Hollymatic responded with a new agreement that would result in probation rather than termination. After the parties failed to come to terms over the amount of patty paper that Taylor would purchase each month, Hollymatic severed relations.

Taylor adduced statements made by Hollymatic executives indicating a policy of requiring dealers to purchase exclusively Hollymatic patty paper as a condition for purchasing other

---

[5] Taylor does not claim that Hollymatic used the tie to effect price discrimination in violation of the Robinson-Patman Act. See 15 U.S.C. § 13, et seq.

Hollymatic products, and evincing an intent to make an example of Taylor for failing to abide by that requirement. Hollymatic in turn acknowledges that its dissatisfaction with Taylor stemmed in part from Taylor's decision not to purchase patty paper from Hollymatic beginning in 1988. Indeed, Hollymatic also accuses Taylor of purchasing "counterfeit" Hollymatic spare parts. Nevertheless, Hollymatic claims that its termination in 1990 of its relationship with Taylor was not a response to Taylor selling the products of other companies.

Taylor seeks damages for the loss of profits it suffered in the five years subsequent to Hollymatic's cessation of business relations. Taylor asserted at trial that it could have made profits of approximately $80,000 each year for a present value total of roughly $370,000. Taylor acknowledged that, after a lapse of five years, it could recover from the loss of Hollymatic's product line. The jury found for Taylor and awarded $296,662.60 in damages, trebled as a matter of law to $889,987.80.[6]

---

[6] Hollymatic appeals the district court's denial of its motion to dismiss Taylor's complaint, its motion for summary judgment, its motion for judgment as a matter of law, its renewed motion for judgment as a matter of law, and its motion for a new trial. See Fed. R. Civ. P. 12(b)(6), 56, 50(a), 50(b), and 59(a). As a jury ruled on the evidence at trial, we need not consider whether at any given stage Hollymatic might have prevailed. We assess instead the propriety of the jury verdict. See, e.g., Bealmer v. Texaco, Inc., 427 F.2d 885, 886 (9th Cir.), cert. denied, 400 U.S. 926 (1970) (refusing to entertain appeal of denial of summary judgment after final resolution of case). Compare Savarin Corporation v. National Bank of Pakistan, 447 F.2d 727, 732 (2d Cir. 1971) (entertaining challenge of denial of summary judgment after final resolution of case) with Glaros v. H.H. Robertson Co., 797 F.2d 1564, 1573 (Fed.Cir. 1986) (criticizing Savarin and refusing to entertain appeal of denial of summary judgment).

4

Hollymatic argues that insufficient evidence supported the jury's finding of a tie.  Hollymatic also contends that the evidence did not support the conclusion that Hollymatic threatened, or caused the kind of harm, to competition necessary for an antitrust violation.  We do not pause over the question of whether there was a tie because we conclude that, assuming there was one, Taylor failed to prove that it was illegal.[7]  We also conclude that the insufficiency of the evidence is fatal to Taylor's alternative theories.

A.

Taylor does not claim that Hollymatic limited the choices available to consumers.  Hollymatic required Taylor, a dealer, to provide only Hollymatic patty paper.  Customers purchasing patty machines from Taylor remained free to buy paper elsewhere.  Only

---

Hollymatic provides support only for the contention that it may appeal the district court's denial of its Rule 12(b)(6) and summary judgment motions.  Hollymatic cites two cases in which we entertained interlocutory appeals of, respectively, denial of a motion for summary judgment and of a motion under Rule 12(b)(6), both requested on the basis of qualified immunity.  See Spann v. Rainey, 987 F.2d 1110, 1112 (5th Cir. 1993); Jackson v. Beaumont Police Dept., 958 F.2d 616, 618 (5th Cir. 1992).  Qualified immunity provides a rare exception to the general rule that we will not address on appeal a denial of summary judgment.  Hollymatic offers no grounds for entertaining appeals of motions denied prior to the jury's verdict in cases that do not involve qualified immunity.

[7]  We review the evidence to determine whether a reasonable jury could have found for Taylor.  R.D. Imports Ryno Indus. v. Mazda Distrib., 807 F.2d 1222, 1224 (5th Cir.), cert. denied, 484 U.S. 818 (1987).  Hollymatic also contends that the district court committed reversible error in instructing the jury.  We do not address this issue because we rule for Hollymatic on other grounds.

Taylor was bound.  As we examine Taylor's complaints about this restriction, we must keep in mind that the antitrust laws protect competition, not competitors.[8]  Ultimately, the consumer is the beneficiary.

An illegal tie may be shown by proof that the tying firm "exert[s] sufficient control over the tying market . . . to have a likely anticompetitive effect on the tied market."[9]  This is sometimes described as "per se" illegality.  This label makes sense when describing price fixing or horizontal market division, but is confusing here because it insists on an inquiry into market power as a predicate to "per se" illegality.

This odd use of the term "per se" is descriptive of a rule located between a per se and a rule of reason inquiry.  The best that can be said for it is that it reflects the intermediate danger tying arrangements pose to the market:  unlike other "per se" illegal arrangements, "not every refusal to sell two products separately can be said to restrain competition."[10]  Rather, there must be proof "as a threshold matter . . . [of] a substantial

---

[8]  See Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962) (antitrust laws provide "protection of competition, not competitors."); Continental T. V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 53 n.21 (1977) (antitrust jurisprudence deals primarily with "market considerations," not with "restrictions on the autonomy of independent businessmen").

[9]  Breaux Bros. Farms v. Teche Sugar Co., 21 F.3d 83, 86 (5th Cir. 1994) (citing Jefferson Parish Hops. Dist. No. 2 v. Hyde, 466 U.S. 2, 15-18, 26-29 (1984)).

[10]  See Jefferson Parish, 466 U.S. at 11.  See also id. at 32-44 (O'Connor, J., concurring) (arguing that per se analysis should not apply to tying arrangements).

potential for impact on competition in order to justify per se condemnation" of a tie.[11]

The alleged tying arrangement between Hollymatic and Taylor was a form of vertical nonprice restraint, that is, "an agreement between entities at different levels of distribution that does not purport to affect prices charged for . . . goods."[12] Vertical nonprice restraints are generally not subject to per se analysis.[13] Ties, however, are often instrumental to suspect vertical nonprice restraints. They may enable an entity to circumvent laws proscribing anticompetitive or other behavior. Thus, for example, a firm may avoid price regulation,[14] may engage in price discrimination,[15] or may undertake predatory pricing through the use

---

[11]   Id. at 16.

[12]   Smith Machinery Co., Inc. v. Hesston Corp., 878 F.2d 1290, 1295 (10th Cir. 1989), cert. denied, 493 U.S. 1073 (1990) (footnote and citations omitted).  See Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.") (footnote omitted).

[13]   See Business Electronics, 485 U.S. at 735-36 ("[E]conomic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal per se unless it includes some agreement on price or price levels.").

[14]   See Jefferson Parish, 466 U.S. at 36 n.4 (O'Connor, J., concurring) ("In a regulated industry a firm with market power may be unable to extract a supercompetitive profit because it lacks control over the prices it charges for regulated products or services.  Tying may then be used to extract that profit from sale of the unregulated, tied products or services.") (citations omitted).

[15]   See id. ("Tying may . . . help the seller engage in price discrimination by 'metering' the buyer's use of the tying product.") (citations omitted).

of a tie.[16]  Taylor does not allege that Hollymatic pursued any of these specific ends.  More generally, a firm may leverage power in one market into additional power in another.  This leveraging can force existing competitors from the tied market or create barriers to entry.[17]  As the tied market weakens, the tying firm's market power may increase.[18]

Tying arrangements that threaten competition come in myriad industries.  A seller of machines, for example, may condition the availability of parts on the purchase of repair services,[19] or a hospital may provide care only if patients use particular anesthesiologists.[20]  Their common ground is ultimate consumers have to buy one product or service to receive another, removing them from the market for the tied good.

Where, however, <u>only</u> dealers are subject to a tie,[21] competitors do not lose a segment of the tied market if there are

_____

[16]  <u>See generally</u> E. Thomas Sullivan and Jeffrey L. Harrison, <u>Understanding Antitrust and Its Economic Implications</u> 183-85 (2d ed. 1994) (summarizing rationales for proscribing tying arrangements).

[17]  <u>See</u> <u>Jefferson Parish</u>, 466 U.S. at 14-15; <u>id.</u> at 36-40 (O'Connor, J., concurring).

[18]  <u>See generally</u> Louis Kaplow, <u>Extension of Monopoly Power Through Leverage</u>, 85 Colum. L. Rev. 515, 520-25 (1985).

[19]  <u>See</u> <u>Eastman Kodak Co. v. Image Technical Servs.</u>, 112 S.Ct. 2072 (1992).

[20]  <u>See</u> <u>Jefferson Parish</u>, 466 U.S. at 4-5.

[21]  <u>Cf.</u> <u>Fortner Enterprises, Inc. v. U.S. Steel Corp.</u>, 394 U.S. 495 (1969) (<u>consumers</u> and intermediaries in line of distribution required to purchase home to receive loans on favorable terms) <u>and</u> 429 U.S. 610 (1977) (same case).

8

genuine alternative paths to consumers. Here, assuming a tie was in place, customers could purchase Hollymatic patty machines from Taylor and purchase patty paper elsewhere. Alternative distributors did not have to be robust to compete; they merely had to exist. Companies entering the patty paper market could attract Taylor's customers provided they charged a lower price, produced a superior product, or both. Ties that constrain only dealers, like the one Taylor complains of, create relatively little danger to competition,[22] provided consumers may purchase the two goods separately.[23]

As we have suggested, mechanical inquiry into the fit of per se categories has little utility in exposing any injurious impact upon competition of ties. Inquiry into Hollymatic's power in the tying market tells us nothing of other patty paper distributors. Ronnie Taylor testified, "Patty paper was I guess always available through paper companies if customers called and asked paper companies about it." When asked if paper "was always available to end users in [his] territory," he replied, "Yes." The evidence

---

[22] See Phillip E. Areeda, Antitrust Law, ¶ 1725b, at 316-18 (1991).

[23] Where the only competition for an item occurs at the level of the distributor, a tie at that level may foreclose part of the market to competitors in the tied good. If a company sells canning machinery on condition that a canner also buys cans, the consumers will purchase the two as a single product. Competitors will not be able to sell cans directly to consumers of canned goods. See id. ¶ 1725b, at 317 (providing this example). A similar situation arose in United States v. Loew's, Inc., 371 U.S. 38 (1962). Distributors conditioned purchases by television stations of desirable films on purchases of undesirable films. Consumers received transmission of both.

suggests that competition in patty paper sales was fierce, and that Hollymatic was dependent on Taylor's aggressive efforts to move its product. Under these circumstances, any obligation on Taylor to carry only Hollymatic's patty paper would have enhanced competition by ensuring Hollymatic access to the market. Yet assessing Hollymatic's power in the tying market, and whether there was a not insubstantial amount of commerce in the tied market, would not uncover this fact.

The present situation is analogous to others in which a manufacturer requires a dealer to carry one product in its line to receive another. The Tenth Circuit addressed these circumstances in Smith Machinery Co. v. Hesston Corp.,[24] in which a manufacturer conditioned sale of farm equipment to a dealer on purchase of its tractors.[25] The court acknowledged that the arrangement constituted a tie but focused on the risk posed to competition rather than on labels.[26] Although free to sell tractors from other manufacturers, the dealer complained that in light of its limited resources purchase of one tractor would foreclose purchase of another. The court responded that this claim "[e]ven if true" would not affect its analysis.[27] The court reasoned:

---

[24] 878 F.2d 1290 (10th Cir. 1989), cert. denied, 493 U.S. 1073 (1990).

[25] Id. at 1291-92.

[26] See id. at 1295 (citing Jefferson Parish, 466 U.S. at 21 n.34).

[27] Id. at 1296.

10

> [W]here a dealer is serving as an intermediate link in a distribution chain, if one manufacturer is foreclosed from selling to a dealer because of [an] arrangement, it is likely going to find another way to take its product to market, providing a profit potential continues to exist. In such a case, there is no ultimate foreclosure to the consumer of a choice of goods. In other more traditional tying arrangements there is an ultimate foreclosure of choice to the ultimate consumer. Thus, a foreclosure of choice to an ultimate consumer appears to be the principal key to a tie that is illegal per se. No such foreclosure occurs or is threatened in a typical line forcing situation such as that at bar.[28]

We find the same to be true of the alleged tie in the present case. The claimed arrangement between Hollymatic and Taylor constituted a vertical nonprice restraint between a manufacturer and a dealer on goods that the dealer offered to customers independently. It was in effect an exclusive-dealing agreement in which Hollymatic required Taylor to sell Hollymatic, and only Hollymatic, patty paper.[29] Such an arrangement is not the sort "that would always or almost always tend to restrict competition and decrease output."[30] It does not threaten competition to the

---

[28] Id. at 1297 (citing Jefferson Parish, 466 U.S. at 5; Loew's Inc., 371 U.S. at 40; Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 3 (1958); International Salt Co. v. United States, 332 U.S. 392, 393 (1947)).

[29] See Roland Machinery Co. v. Dresser Indus., Inc., 749 F.2d 380, 393-94 (7th Cir. 1984) (Posner, J.) (arguing that exclusive-dealing agreements which require dealer to sell only manufacturers product line are assessed under "Rule of Reason") (cited with approval in Stitt Spark Plug Co. v. Champion Spark Plug Co., 840 F.2d 1253, 1258 n.18 (5th Cir.), cert. denied, 488 U.S. 890 (1988)).

[30] Business Electronics, 485 U.S. at 723 (quoting Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289-290 (1985) (quoting Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 19-20 (1979))) (internal quotation marks omitted).

same extent as tying arrangements that bind ultimate customers. Regardless of whether the restraint also constitutes a tying arrangement, subjecting it to per se analysis would ignore our directive from the Court.[31] The measure of legality of relationships between manufacturers and independent distributors must not be allowed to turn on labels. Here the language of per se violations has little utility in the absence of price fixing or horizontal division of markets.

B.

The alleged tie was nevertheless illegal if it "had an actual adverse effect on competition."[32] Taylor's dissatisfaction resulted from competition in the patty paper market. Taylor claims to have lost business because Hollymatic's prices made it difficult for Taylor to compete. Ronnie Taylor, a member of the family that owned and ran Taylor Sales, Inc., complained that because of Hollymatic's high patty paper prices, Taylor "began to lose customers to competition." These signs of a healthy market in

---

[31] See id. at 726 ("departure from [the rule-of-reason] standard must be justified by demonstrable economic effect, such as the facilitation of cartelizing, rather than formalistic distinctions") (interpreting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984) and Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36 (1977)); Jefferson Parish, 466 U.S. at 21 n.34 ("The legality of . . . conduct depends on its competitive consequences, not on whether it can be labeled 'tying.' If the competitive consequences of [an] arrangement are not those to which the per se rule is addressed, then it should not be condemned irrespective of its label.").

[32] Breaux Brothers, 21 F.3d at 86 (quoting Jefferson Parish, 466 U.S. at 31) (internal quotation marks omitted).

patty paper belie Taylor's claim that the tying arrangement harmed patty paper purchasers.

Taylor's claim was, ironically, that it lost customers to competitors; that the consumer's response to the asserted high price of paper was to purchase paper elsewhere. Now, this may have cost Taylor money--injured it--but it belies its claim of injury to competition. Purchasers of machines from Taylor simply found a different seller. Taylor's incentive to accept Hollymatic's requirement that Taylor buy its paper rested on the profitability of its machine sales.

Taylor characterizes as a threat to competition the possibility that patty paper purchasers bought Hollymatic's paper at supracompetitive prices. The claim is:

> A customer receiving Hollymatic machines, parts, and service from a Hollymatic dealer may well buy the Hollymatic Patty Paper because of that "common tie" to the dealer. After all, that is more convenient to the customer than seeking an independent source who could sell patty paper at a competitive price.

The Supreme Court rejected such reasoning in Jefferson Parish. The fact that consumers might buy goods because of convenience created by a tie does not suffice as evidence of an unreasonable restraint on competition.[33] Speculation about anticompetitive effects is not enough. Taylor had to show that the tie "as it actually operate[d] in the market"[34] harmed competition. The record does not indicate

---

[33]  Id. at 29-30.

[34]  Id. at 29.

13

that consumers continued to purchase Hollymatic patty paper at prices above the market.

                              III.

This lack of evidence also defeats Taylor's claim of conspiracy under § 1 of the Sherman Act.[35]  Taylor claims that Hollymatic conspired with Bomarko to restrain trade.  The elements of a § 1 claim are:  "1) joint or concerted action between more than one party that 2) unreasonably restrains trade in 3) interstate or foreign commerce."[36]

Taylor's claim of conspiracy is derivative of its tying claim. Taylor contended in its closing argument:

> Hollymatic was being pressured to buy more paper than it
> could sell.  Hollymatic in turn was putting pressure on
> its dealers.  Why?  Because Bomarko and Hollymatic
> together could not compete in a free market--not and both
> of them take double digit profits they were taking.

Taylor implicated Bomarko in the alleged tying arrangement. This accusation is consistent with the request for damages resulting from termination, which followed from enforcement of the claimed tie.  The conspiracy claim fails because the underlying tie was not illegal--the concert of action did not unreasonably restrain trade.

To establish an unreasonable restraint of trade, Taylor's proof must have included evidence from which the jury could have

---

[35]  15 U.S.C. § 1.

[36]  R.D. Imports Ryno Indus. v. Mazda Distrib., 807 F.2d 1222, 1224 (5th Cir.), cert. denied, 484 U.S. 818 (1987).  Hollymatic argues that it and Bomarko were not distinct entities and that the two therefore could not have conspired.  We need not address this issue because Taylor's § 2 claim fails in any case.

14

found that Hollymatic's actions had a "substantially adverse" impact on competition.[37] Assessing such an impact requires an inquiry into the conditions of the relevant market.[38] As we explained, Taylor provided no basis for concluding that Hollymatic's actions affected competition adversely.

Taylor also contends that Hollymatic amassed monopoly power in the patty machine market in violation of § 2 of the Sherman Act. Market power is the ability to control prices or exclude competition.[39] An assessment of market power requires a definition of the relevant market.[40] This definition requires two limiting terms: "characterization of the product itself and characterization of the relevant geographic market in which that product is sold."[41] Hollymatic complains that Taylor has never defined the market in which Hollymatic wields power. We agree.

Taylor argues that its sales area drew the geographical lines for the market in which Hollymatic possessed power. We find that Taylor failed to offer evidence to support a jury finding that Hollymatic possessed the requisite power in the market for any

---

[37] Id.

[38] Id. ("Market considerations provide the objective benchmark for the measurement of competitive impact.") (citing Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 54 (1977); Daniels v. All Steel Equipment, Inc., 590 F.2d 111, 113 (5th Cir. 1979)).

[39] See Spectrofuge Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 276 (5th Cir. 1978), cert. denied, 440 U.S. 939 (1979).

[40] See Seidenstein v. National Medical Enterprises, Inc., 769 F.2d 1100, 1106 (5th Cir. 1985) ("Before a defendant's market power can be determined, the relevant market must be defined.").

[41] R.D. Imports, 807 F.2d at 1224-25.

particular product in Taylor's sales area.  We assume without deciding that the sales area was the appropriate geographical area for measuring competition.[42]

Taylor's claim of monopoly tracks its allegation of a tying arrangement.  Taylor describes the "Hollymatic Patty Machine" as the tying product, suggesting that Hollymatic amassed power in the market for this machine and its competitors.  However, Hollymatic contends, and the record confirms, that the "Hollymatic Patty Machine" does not exist.  Taylor's arguments on appeal and the record indicate that Taylor may have intended to refer to either of two possible product markets:  the market for the Super Patty Machine, a particularly successful Hollymatic product; or the market for all Hollymatic patty machines.[43]  Taylor failed to prove that Hollymatic possessed monopoly power in either market, or that the Super Patty Machine and comparable machines were sufficiently insulated from competition to constitute a distinct market.

---

[42]  See id. at 1225 ("the geographic dimensions of [a] market encompass[] the areas of effective competition in which the particular product or its reasonably interchangeable substitutes are traded") (quoting Hornsby Oil Co. v. Champion Spark Plug Co., 714 F.2d 1384, 1393 (5th Cir. 1983)) (internal quotation marks omitted).

[43]  Taylor relies on the pretrial order and the jury instructions as identifying the "Hollymatic Patty Machine."  The pretrial order, however, describes "Hollymatic hamburger patty machines as a tying product and Hollymatic patty paper as a tied product."  The district court's instruction to the jury similarly explains, "Taylor has alleged that Hollymatic established a tying arrangement whereby Hollymatic sold Taylor hamburger patty machines (the tying product) conditioned on Taylor purchasing Hollymatic patty paper (the tied product)."  These sources indicate that the jury addressed Hollymatic's power in the market for patty machines in general, not in the market for the Super Patty Machine.

We could assume that Taylor meant the tying market to include Hollymatic's Super Patty Machine and comparable machines sold by other manufacturers. Taylor at times adopts this approach, noting that all parties to the litigation acknowledge the prominent place in the market of the Super Patty Machine. This testimony sometimes suggested that the Super Patty Machine was a "lead product," "flagship product," "market leader," "dominant," and "premiere product." Beyond these general descriptions of market success, however, Taylor provides little basis for a conclusion that Hollymatic possessed monopoly power in the market consisting of the Super Patty Machine and its competitors. Taylor does not specify the percentage of sales attributable to the Super Patty Machine in any market[44] or provide any basis for even a rough estimate of such a figure, nor does Taylor recount information useful in assessing the strength and scope of competition in the market for the Super Patty Machine.[45]

Significantly, there was inadequate evidence about other products available to Hollymatic's customers. Hollymatic faced competition, for example, from manufacturers of machines that produced patties on a larger scale than the Super Patty Machine. In the mid-1980s, Wendy's, at the time a faithful customer of Hollymatic, abandoned the Super Patty Machine for larger machines sold by a rival of Hollymatic, which Wendy's stationed in central

---

[44] See, e.g., Jefferson Parish, 466 U.S. at 26-28 (identifying percentage of particular market garnered by tying product); Breaux Bros., 21 F.3d at 86-88 (same).

[45] See Jefferson Parish, 466 U.S. at 26-28.

locations.  This event indicates that larger machines provided a viable alternative to the Super Patty Machine, at least in a substantial segment of the market.  It also increased the supply of used Super Patty Machines, which decreased sales in new machines.

Ronnie Taylor acknowledged selling used Super Patty Machines at a profit equal to or greater than the profits available from selling new machines, both before and after Hollymatic terminated his dealership.  These competitive threats to the Super Patty Machine are at odds with a claim of market power--a concept that is not interchangeable with market success.  Despite these disquieting features of the market, Taylor provided no evidence of the size and strength of the market in used machines or the incidence of customers changing to larger machines.  This illustrates the absence of focus upon market power.  Without such basic information about the market, the jury had no means to assess the market power the Super Patty Machine conferred on Hollymatic.

Taylor may have meant the term "Hollymatic Patty Machine" to refer, instead, to all of Hollymatic's patty machines.  Thus, Roy B. Taylor, a member of the family that owns Taylor, was asked, "And you are saying that the continuation of being able to sell the Super Machine is what forced you to sell paper at a higher price at that amount of profit?"  He responded, "No, sir.  I am saying the failure to sell all their patty machines."  The jury did not, however, have a sufficient basis for concluding that Hollymatic possessed monopoly power in the market for all patty machines.

Taylor relies on only two statements that Roy B. Taylor made about Hollymatic's presence in the patty machine market. First, Mr. Taylor provided "just an estimate" that in 1979 of the 200 to 300 patty machines in his territory, no more than five were manufactured by Hollymatic's competitors. This statement casts little light on Hollymatic's power in the patty machine market at relevant times. Second, Mr. Taylor responded to the question, "What percentage or share of the patty machine market to the customers that you were serving, customer base that you were serving, did you have as a Hollymatic distributor?" Mr. Taylor answered, "Conservatively I think I could honestly say 95 percent of the business." While Mr. Taylor acknowledged that there were machines competitive with Hollymatic's products, he claimed that they did not "perform efficiently" and that "some" of them were no longer on the market. Mr. Taylor did not define his "patty machine market" such as the range of patty machines that the market included. Testimony indicated that Hollymatic was "the industry leader" in certain lines of patty machines but, as we explained, did not suggest the share of the market Hollymatic controlled or the nature of the competition Hollymatic faced. The evidence indicates that customers could purchase used machines or replace several small patty machines with a single large one sold by a competitor of Hollymatic.

Importantly, there was no evidence of significant barriers to entry. In the absence of barriers to entry such as a capital intensive industry or patents, a competitor waiting on the

19

sidelines can deny those in the market the power to control prices-
-because current players cannot exclude competition.

In short, Taylor offered no direct evidence that Hollymatic
could control prices in the market for patty machines or for any
particular machine, and offered no evidence of Hollymatic's share
in either market.  As a result, "[t]here was simply no evidence
from which the jury could begin to measure [Hollymatic's] power to
control prices or to exclude competition in [any] relevant
market."[46]  Taylor offers no reason to believe that Hollymatic
acquired or maintained,[47] or threatened to acquire or maintain,[48] a
monopoly.  Taylor cannot succeed under § 2 of the Sherman Act.

Finally, Taylor claims that Hollymatic's actions violated the
Texas Free Enterprise and Antitrust Act.[49]  The parties agree that

---

[46]  Spectrofuge Corp., 575 F.2d at 286.

[47]  Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d
480, 487 (5th Cir. 1984) ("[T]he offense of monopoly under § 2 [of
the Sherman Act] has two elements:  (1) the possession of monopoly
power in the relevant market and (2) the willful acquisition or
maintenance of that power as distinguished from growth or
development as a consequence of a superior product, business
acumen, or historic accident.") (quoting United States v. Grinnell
Corp., 384 U.S. 563, 570-71 (1966)) (internal quotation marks
omitted).

[48]  See id. at 490 ("The offense of attempted monopolization
has two elements:  (1) specific intent to accomplish the illegal
result; and (2) a dangerous probability that the attempt to
monopolize the relevant market will be successful.") (quoting
Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc., 679 F.2d 516, 525
(5th Cir. 1982), cert. denied, 103 S.Ct. 1770 (1983); Spectrofuge
Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 276) (5th Cir.
1978), cert. denied, 440 U.S. 939 (1979)) (internal quotation marks
omitted).  See Spectrum Sports, Inc. v. McQuillan, 113 S.Ct. 884,
892 (1993) (requiring proof of dangerous probability of monopoly
for attempt claim under § 2 of Sherman Act).

[49]  Tex. Bus. & Comm. Code Ann. § 15.05(a)-(c).

20

Texas antitrust law mirrors federal law as applied to the present case.[50]  State law does not offer an alternative grounds for affirmance.

REVERSED.

---

[50] See Caller-Times Pub. Co. v. Triad Communications, Inc., 826 S.W.2d 576, 580 (Tex. 1992).