IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-41110
_____


STEWART GLASS & MIRROR, INC., ET AL.,

                                        Plaintiffs,

STEWART GLASS & MIRROR, INC.; TEXAS MOBIL
AUTO GLASS, INC.; RLJ, INC., doing business
as A-1 Glass Co.; FREDDY'S AUTO GLASS & MIRROR,
INC.; NEDERLAND GLASS CO., INC.; LONE STAR
GLASS, INC.; AUTO GLASS SPECIALISTS, INC.;
ALAMO GLASS OF PORT ARTHUR, INC.; RAY GLASS
COMPANY, INC.,

                                        Plaintiffs-Appellants,

                    v.

U.S. AUTO GLASS DISCOUNT CENTERS, INC., ET AL.,

                                        Defendants,

U.S. AUTO GLASS DISCOUNT CENTERS, INC.;
SAFELITE GLASS CORP.; HARMON GLASS COMPANY,
INC.; WINDSHIELDS AMERICA, INC.; USA GLAS, INC.,

                                        Defendants-Appellees.


_____

Appeal from the United States District Court
for the Eastern District of Texas
_____
January 6, 2000

Before POLITZ, DeMOSS, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

    Appellants, eight independent, Texas-based auto repair shops
engaged in the business of repairing and replacing auto glass and
residential and commercial flat glass, appeal from the district
court's grant of summary judgment to appellees, two competitors

not based in Texas but also competing in the Texas auto-glass repair market, on several claimed violations of the anti-trust laws, as well as a claim sounding in Texas tort law based on intentional interference with contract.[1]  Because we find that the appellants have failed to raise any genuine issues of material fact in support of their claims, we affirm.

## I.  Background

Appellants and appellees are primarily engaged in the same enterprise: the replacement and repair of automobile glass. Appellants are small, independent shops, incorporated and doing business in the State of Texas.  Appellees are much larger, nationally organized corporations engaged in the automobile glass repair and replacement business nationwide.

It is undisputed that each appellees' glass repair business is divided into two primary segments: company-owned glass repair shops and a glass repair network.  It is the ownership and operation of the network component of appellees' business of which appellants complain.

---

[1]  The eight appellants are Stewart Glass & Mirror Inc.; Texas Mobil Auto Glass Inc.; RLJ Inc., doing business as A-1 Glass Co.; Freddy's Auto Glass & Mirror Inc.; Nederland Glass Co. Inc.; Lone Star Glass Inc.; Auto Glass Specialists Inc.; Alamo Glass of Port Arthur Inc.; and Ray Glass Company Inc.  The original four defendants at the time this action commenced included US Auto Glass Discount Centers Inc., Safelite Glass Corp.; Harmon Glass Company Inc.; Windshields America Inc.; and USA Glas Inc.  Since the time of filing, Windshields America and USA Glas merged to form a single company, Vistar Inc.  Vistar then merged with Safelite Glass, leaving two appellees in this matter: Vistar Inc. and Harmon Glass Company.

The networks were designed and instituted to perform a function demanded by the primary buyer of automobile glass repair services: insurance companies. As a large segment of the auto-insurance market relates to the replacement of auto glass, the insurance companies began to demand more efficient means to fulfill the needs of their policy-holders, while simultaneously reducing costs by centralizing claims handling and payment processing. The networks were designed to fill this demand.

The networks all function similarly. Periodically, the network companies bid for the right to enter into regional or national agreements with insurers to provide a claims management network service to the insurer's policy-holders.[2] Once a bid is secured, the network company must maintain an 800 number call-processing center to receive and process calls from insureds seeking auto glass repair services.[3] While the networks operate under the guise of the insurance company, they are in fact owned and maintained by the network companies - appellees in this matter.

The appellee-network companies each own individual glass

---

[2] Not all insurance companies maintained exclusive arrangements with one network. Some insurance companies elected instead to award multiple bids to several competing companies to fulfill the needs of their policy-holders. When an insurance company elects this system over an exclusive arrangement, calls are rotated among the networks based on percentages set by the insurance company, derived largely from the differing performance profiles of the networks.

[3] Insureds might telephone the toll-free number directly, or might alternatively telephone their insurance company, and then be transferred to the call center for processing of their claims.

shops capable of performing repair work.  However, no network's shops alone are capable of providing the nationwide coverage demanded by insurance companies.  As such, network companies negotiate separate contracts with independent shops across the nation.  These contracts are non-exclusive, and many independent shops choose to join multiple networks.  Each shop individually negotiates the price at which it will provide services - usually determined based on the relevant region of the country and the respective prices insurance companies are willing to pay for the services offered. Once under contract, the network affiliate independent shops agree to accept work from the networks at the pre-arranged price.

It is also undisputed that subcontracting arrangements exist between network-owned glass shops and competing networks.  The contracts are negotiated in the same manner contracts with independent shops are formed.  This subcontracting situation reflects the reality that any given network cannot otherwise guarantee national coverage as demanded by the insurance companies.

When a policy-holder telephones his respective insurer requesting service, a customer service representative from the insurer's contracted network call center reads from an insurer-approved script concerning the policy-holder's options.  The policy-holder will then be informed of the location of several network owned or affiliated shops under contract to perform the repair work.  The policy-holder will also be asked whether he has

a preference as to the shop he would like to use.  If the policy-holder has a preference, he is always free to use that shop, and the network respects that choice.  Typically, however, policy-holders are encouraged to utilize network affiliated shops.

Once the work is performed, the policy-holder remits the amount of his deductible to his selected repair shop.  The network then pays the remaining fee due to the affiliated shop under the pre-negotiated contract.  As the final step in this process, the network bills the insurance company according to the terms of the existing agreement.

Network companies only benefit from this arrangement when the price negotiated between the network and the insurance company exceeds the price negotiated between the network and the affiliate.  While this is most often the case, in some instances networks are required to maintain contracts with independent shops at prices which exceed the insurance companies contracted price, in order the meet the demands for nationwide coverage. The usual positive difference between the two prices negotiated by the network represent the costs associated with maintaining and operating the network call center.  Any money earned in excess is profit for the network.  While networks obviously have a financial incentive to negotiate prices with affiliated shops that will allow for this profit, the relationship is also driven by the need for the networks to offer comprehensive regional or national coverage, in order to secure insurance contracts in the first instance.

Appellees are not the only companies that own and maintain networks in response to this demand from insurance companies. There are several national networks performing the same function not named as defendants in this matter. One such network, known as LYNX, is operated by a large glass manufacturer, PPG. As PPG does not own any glass shops, all members of the LYNX network are independent shops, including all but one of the appellants in this matter. Each network competes for insurance contracts, and each, including LYNX, appear to have secured insurance-contracted business.[4]

Appellants sued appellees, claiming that these network arrangements constitute a violation of both Sections 1 and 2 of the Sherman Act,[5] as well as various claims under Texas law. The district court dismissed several of these claims in partially granting defendant-appellants' motion to dismiss. See Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc., 940 F.Supp. 1026 (E.D. Tex. 1996). The remaining claims include Section 1 claims for unreasonable restraint of trade and unlawful boycott;[6] a Section

---

[4] In 1997, LYNX secured the contract for State Farm, the nation's largest auto insurer, and thus had access to 25-30% of the national auto insurance market.

[5] 15 U.S.C. §§ 1-2.

[6] Appellees correctly note that appellants' brief fails to articulate with specificity the various claims alleged on appeal. Rather, appellants merely offer an omnibus argument concerning purported violations of Section 1. We have construed these arguments as liberally as possible in concluding that the evidence fails to substantiate any anti-competitive behavior on the part of appellees.

claim for monopoly, attempt to monopolize, and conspiring to monopolize the auto glass repair market; and, a claim for tortious interference with contract in violation of Texas common law. The district court granted defendant-appellees' motion for summary judgment on each of these claims. See Stewart Glass & Mirror, Inc., et al. v. U.S.A. Glas, Inc., et al., 17 F.Supp.2d 649 (E.D.Tex. 1998). Appellants timely appealed.

## II. Standard of Review

This Court reviews the grant of summary judgment de novo. S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). Summary judgment is proper, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputed facts preclude summary judgment if the evidence would allow a reasonable jury to return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

While "it is true that summary judgment is less common in antitrust cases than in other cases, [] this is not because different rules apply to those cases. Rather, it is because the relevant factual disputes in antitrust cases are typically more complicated than those in other cases." Consolidated Metal Prod. v. Amer. Petro Institute, 846 F.2d 284, 288 (5th Cir. 1988) (citations omitted). Mindful of this general caution, we proceed

7

with an analysis of each claim, applying the standards of the statutes appellants claim have been violated.

III.  Analysis

A.  Section 1 of the Sherman Antitrust Act

Section 1 of the Sherman Antitrust Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal."  15 U.S.C. §1.  "To prevail on a Section 1 claim, plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market."  Johnson v. Hospital Corp. of America, 95 F.3d 383 (5th Cir. 1996).  Additionally, the Supreme Court clarified in Matsushita Elec. Indus. Co. v. Zenith Radio, that antitrust plaintiffs must prove they have suffered an injury stemming from the complained-of anti-competitive behavior.  475 U.S. 574, 586 (1986).

While it is true that this Court must view all inferences to be drawn from the underlying facts "in the light most favorable to the party opposing [a summary judgment] motion,"  Matsushita, 475 U.S. at 587 (quoting United States v. Diebold, 369 U.S. 654, 655 (1962)), we remain cautious in Section 1 cases as "antitrust limits the range of permissible inferences from ambiguous evidence."  Id. at 588.  More simply stated, "[t]o survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present

8

evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." Id. at 588 (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)).

In this case, not uniquely, appellants proffer circumstantial evidence in support of their claim that appellees illegally conspired to restrain trade in violation of Section 1. Antitrust plaintiffs may fairly rely on circumstantial evidence to defeat a motion for summary judgment. However, appellants bear the burden of coming forth with evidence sufficient to infer the existence of an antitrust conspiracy. See Johnson, 95 F.3d at 392.

As appellants do not argue on appeal that the actions taken by the networks were *per se* unlawful, they bear the burden of demonstrating facts sufficient to demonstrate that the complained-of actions unreasonably restrained trade contrary to the judicially constructed rule of reason. "To prove a Section 1 violation under rule of reason analysis, [appellants] must show that the defendants' activities caused an injury to competition." Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc., 123 F.3d 301, 307 (5th Cir. 1997) (citing Roy B. Taylor Sales, Inc. v. Hollymatic Corp., 28 F.3d 1379, 1385 (5th Cir. 1994)). This rule of reason requires us to examine the unreasonableness of the asserted restraint on competition, "looking to 'all of the circumstances of the case, including the facts peculiar to the business and the history of, reasons for, and market impact of the restraint. . . .'" Royal Drug Company,

Inc. v. Group Life and Health Insurance Co., 737 F.2d 1433, 1436 (5th Cir. 1984) (quoting Medical Arts Pharmacy v. Blue Cross & Blue Shield of Connecticut, Inc., 675 F.2d 502, 504 (2d Cir. 1982)).

Appellants' primary contention is that the network glass programs were designed and implemented with the express purpose of eliminating small, independent shops from the marketplace. Specifically, appellants contend that the interrelationships between the insurance companies and the respective networks go beyond simply a legal buyer-seller relationship, and in fact were somehow transformed into illegal, horizontal arrangements designed to exclude small players from the marketplace.

Appellants' contentions find no support in the summary judgment evidence. Insurance companies demanded that the market for auto glass repair provide services in addition to simple replacement of windshields. Insurance companies demanded the formation of networks to manage claims and more efficiently arrange for the services required by policy-holders. Nothing indicates that the networks operate as anything more than preferred providers, once the contracts are awarded. As "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy," Matsushita, 475 U.S. at 588, we refuse to find a violation based solely upon the existence of contracts between insurance companies and auto glass repair providers.

These preferred provider relationships function based on a

10

series of vertical buyer-seller relationships that remain perfectly within the bounds of law. Insurance companies enter into legal, vertical agreements with one, sometimes more, network companies to provide service. Network companies, in turn, enter into separate legal, vertical agreements with shops capable of providing auto glass repair service nationwide, so as to meet the needs of insurance companies.[7]

Critical to this arrangement, each glass shop separately negotiated the prices at which it would agree to accept network-referred work. The insurance companies did nothing to demand or fix the price at which these services would be offered, and, indeed, the evidence demonstrates that they simply could not have placed such demands, as the insurance companies had no interaction with the independent, or even the network-owned, shops that composed the network.

Furthermore, there is no evidence to support the claims made by appellants that the networks fixed prices or illegally coerced

---

[7] Appellants make much of the fact that any given network in this system might contract with the shops owned by competing networks. The evidence demonstrates that these contracts were nothing more than vertical agreements, separately negotiated, to the benefit of both the network and the shops involved. These contracts were motivated by the legitimate business interest of network-owned shops in securing work from insurance companies with whom their own network failed to secure a contract. These subcontracting arrangements, however, do not represent illegal horizontal agreements between the networks: they are nothing more than contracts between a supplier and a purchaser of a particular service for a negotiated price.

independent shops into the network system.[8]  The evidence, in fact, points in the opposite direction:  independent shops retain the contractual right to enter or leave networks as their business judgment dictates.  Reflecting this reality, several appellants in this case at one time or another joined various and multiple networks freely, left networks when prices were unacceptable, and outright rejected offers to join several appellee networks.[9]

In an effort to substantiate these claims, appellants draw our attention to the subcontracting arrangements between each network and competitor network-owned glass shops, as evidence of an alleged boycott.[10]  The attempt to characterize these agreements as horizontal restraints on trade is unpersuasive.

---

[8]  The summary judgment evidence indicates that even the legal market pressure to join networks may not be as significant as stated by appellants.  Network utilization remains relatively low.  The majority of policy-holders continue to exercise their right to choose an auto glass repair shop outside their insurance companies' respective networks.

[9]  The evidence indicates that independents who refuse to join networks still retain a large segment of the auto glass repair market nationwide.  Further, there are several additional players in the market, including networks composed of only independent shops.  All of these networks share in the market for auto glass repair, and openly and vigorously compete for insurance-contract awards.  In fact, LYNX, the network composed primarily of independent shops, secured the lucrative State Farm contract in 1997.

[10]  Appellants contend they were boycotted in favor of competing network-owned shops, as well as through the pricing mechanism employed by the networks with respect to affiliated independents.  However, as previously stated, there is nothing in the record to indicate that the contracts between networks and affiliated independents were anything but freely negotiated, based in large part on regional market patterns.

12

The evidence demonstrates that once a network loses a bid for a particular insurance company's claims, the network-owned shops are in the same position as independent shops, vis-a-vis the winning network: they may choose to subcontract with the winning network to secure insurance work, or they can compete in the open market, with the hope that consumers will select them over network affiliates as they always remain free to do.

Appellants complain that even if they choose to join networks, they are discriminated against by the network in the awarding of work. Again, this claim fails to find support in the record. In fact, the evidence overwhelmingly indicates that once contacted by those seeking service, the networks clearly inform policy-holders they are free to select any shop of their choosing. And, by all indications, consumers exercise this right and frequently choose independent shops affiliated with the networks over network-owned shops.[11]

The only evidence of joint activity occurring between the network companies concerns meetings hosted by the insurance companies to facilitate the operation of the glass replacement programs. The evidence indicates that this situation arose only when an insurance company selected multiple networks to provide the desired service. The meetings usually involved the coordination of promotional materials at the behest of the

---

[11] For example, testimony indicates that Windshields America sub-contracted over $24 million dollars annually to independent shops, and only $1-2 million dollars annually to network-owned shops, during the relevant time period.

13

insurance company, paid for by the networks, to promote the network system.[12]  The evidence, however, indicates that even in this type of circumstance, coordination did not involve setting prices or allocating markets.

In fact, the evidence indicates that when several networks secured contracts with the same insurance company, competition between them remained fierce, as the insurance company allocated a particular percentage of the incoming policy-holder calls to each network depending upon the networks' price performance and customer satisfaction.  No network had any incentive to share information to foster an anti-competitive result, as each network individually benefitted to the detriment of the others in an environment of competition.

The Supreme Court cautions us that if the antitrust claims "simply make[] no economic sense, [appellants] must come forward with more persuasive evidence to support their claim than otherwise would be necessary."  Matsushita, 475 U.S. at 587.  Thus, if the networks in this case "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."  Id.

The antitrust violations asserted here do not make economic sense.  The insurance companies, the relevant consumer in this

---

[12]  Farmers, for example, hosted this type of meeting to coordinate its FASGLAS program, in which all appellee networks were invited to join.

14

marketplace, desired and demanded increased cost-efficiency in the auto glass repair industry. All the evidence indicates that they have managed to achieve just that - millions of dollars in savings annually - by insisting on a competitive environment in which various networks compete for insurance company business.[13] These are savings that are passed down to the ultimate consumer - policy-holders - in a system that only benefits an open marketplace in terms of price reductions.

Further, the evidence indicates that the networks have every economic incentive to vigorously compete with one another for insurance contracts. They stand only to lose by entering into restrictive agreements with one another, considering that their ability to win additional contracts is limited only by their ability to subcontract enough shops to perform the demanded services.

Thus, the desire to compete filters down to the negotiated contracts between networks and independent shops: networks must compete with one another to secure these relationships, and therefore logically offer competitive prices to independents who choose to contract. No network has any economic incentive to frustrate or exclude independent shops, as without the independents the networks themselves could not secure the contracts they need to survive in the marketplace.

---

[13] The summary judgment evidence indicates that Allstate saved in the range of $1.2 to 2.3 million dollars annually, Nationwide saved $12 to 15 million, and USAA saved $2.4 million, subsequent to the implementation of the network system.

15

In sum, the several hundred exhibits submitted in opposition to the summary judgment motion fail to substantiate Section 1 antitrust violations, whether characterized in terms of unreasonable restraint of trade or unlawful boycott.  As such, summary judgment with respect to Section 1 was properly granted, and we affirm.

B.  Section 2 of the Sherman Antitrust Act

Section 2 of the Sherman Antitrust Act provides a cause of action against "single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize."  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 454 (1993).  Monopoly power is understood as "the power to control price or exclude competition."  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).

Although appellants' claims under Section 2 are vaguely stated at best, it is clear on the facts of this case that no single appellee engaged in an attempt to monopolize, nor did any one entity succeed in singularly monopolizing, the auto glass repair market.  Appellees' uncontroverted summary judgment evidence, in fact, points dramatically in the other direction, as the auto glass repair market includes numerous players, both large networks and individual shops, none of which individually wields the power to control prices or exclude competition.

Appellants' claim, rather, must be based on the notion that appellees acted jointly to exclude other participants, namely the independent shops, from freely participating in the market for

16

auto repair work fueled by insurance company demand. Collectively, the argument must run, appellees wielded market power sufficient to dominate the market in monopolistic form. As such, appellants claim must be located in the second clause of forbidden conduct under Section 2: conspiracies to monopolize.

"A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." North Mississippi Communications, Inc. v. Jones, 792 F.2d 1330 (5th Cir. 1986) (citing United States v. Yellow Cab Co., 332 U.S. 218 (1947)) (string cite omitted). This proof is lacking here. As our previous analysis demonstrates, appellants have failed to come forth with sufficient evidence of any agreements or conspiracies, anti-competitive or otherwise, between the appellee networks. As appellants' Section 2 claim is based on a theory of joint action, this lack of evidence is fatal.

As we found under our analysis with respect to appellants' Section 1 claims no evidence of a cognizable claim of conspiracy between or among the respective networks, we hold that summary judgment with respect to Section 2 was properly granted.

C. Tortious Interference with Actual and Prospective Contracts

"Texas law protects existing and prospective contracts from interference." Juliette Fowler Homes, Inc. v. Welch Assocs., Inc., 793 S.W.2d 660, 665 (Tex. 1990). To maintain a cause of

17

action for tortious interference with an existing contract, a plaintiff must demonstrate "(1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damage and (4) actual damage or loss occurred." Johnson, 95 F.3d at 394 (citing Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 939 (Tex. 1991)).  The elements of tortious interference with prospective contract or business relationships are: "(1) reasonable probability that the parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference."  Exxon Corp. v. Allsup, 808 S.W.2d 648, 659 (Tex. App. - Corpus Christi, 1991, writ denied).

In this case, appellants tied their state law claims to the asserted antitrust violations.  Specifically, appellants maintained in their second reply to defendants' motion for summary judgment that as "defendants engaged in unlawful conspiratorial behavior in violation of Sections 1 and 2 of the Sherman Act, and [as] this behavior interfered with Plaintiffs' existing and prospective business relations with various insurance companies and their agents," defendant-appellees were not entitled to summary judgment on the state law claim.  As we find no genuine issue of material fact with respect to the

18

alleged antitrust violations, we fail to see how appellants can maintain a cause of action under state law for tortious interference. Simply stated, appellants' claims rise and fall together, and as the antitrust claims are unsubstantiated, so must be the tortious interference claims.

Appellants attempt to distinguish the two sets of claims on appeal by asserting that Texas law, as interpreted by this Court in Leonard Duckworth, Inc. v. Michael L. Field & Co., 516 F.2d 952, 958 (5th Cir. 1975), requires no more than proof of "unfair" market practices to maintain a cause of action for tortious interference. It is a bedrock principle of appellate review that claims raised for the first time on appeal will not be considered. This rule is equally applicable in summary judgment cases. See FDIC v. Laquarta, 939 F.2d 1231 (5th Cir. 1991) ("This Court has clearly held . . . that it will generally not consider a new ground on appeal raised by an appellant in opposition to summary judgment.") As appellants failed to argue before the district court that their claims for tortious interference could survive summary judgment on the antitrust claims, we will not consider that argument now.

It merits mentioning that our careful review of the summary judgment evidence submitted by appellants in the court below fails to support the newly-offered allegations of tortious interference in any event. Appellants vehemently insist that the evidence points to episodes of untruthful behavior by the network companies in their initial interactions with prospective

19

customers.  Specifically, appellants maintain that lies told to policy-holders with respect to their various auto glass repair options interfered with prospective contracts the independents might have otherwise formed.

Yet upon review, the summary judgment documents put forth in support of these allegations reveal nothing with respect to misleading or untruthful behavior on the part of the network companies.  As appellants failed to support their claim for tortious interference, summary judgment was correctly granted.

### IV.  Conclusion

Because we find, upon careful review of the summary judgment record in this case, no genuine issues of material fact concerning the purported anti-competitive behavior of the network companies, we AFFIRM the district court's grant of summary judgment on appellants' federal antitrust claims and state law tort claim.

AFFIRMED