SOUTHERN HEALTH ASS'N v. HARRIS MEMORIAL METHODIST HOSPITAL.

No. 14602.

Court of Civil Appeals of Texas. Fort Worth.

April 7, 1944.

Rehearing Denied May 5, 1944.

R. W. Gray, of Dallas, and Samuels, Brown, Herman & Scott, of Fort Worth, for appellant.

Simon, Wynn, Sanders & Jones, of Fort Worth, for appellee.

BROWN, Justice.

Southern Health Association, the appellant, is an Insurance corporation organized under Chapter 6 of the Insurance laws of Texas Vernon's Ann.Civ.St. art. 4784 et seq., to do business as a mutual insurance association.

Harris Memorial Methodist Hospital is classed as a charitable hospital corporation, organized under the laws of Texas, and is domiciled in the City of Fort Worth, Tarrant County, Texas.

On June 4, 1937, these two corporations, acting by their respective officers, made the following contract:

"The State of Texas
"County of Tarrant
}
Methodist Hospital in Fort Worth
To
Southern Health Association Hospitalization Agency Contract

"This Contract and Agreement made by and between Methodist Hospital in Fort Worth, hereinafter styled first party, and the Southern Health Association, a corporation, hereinafter styled second party; witnesseth:

"I. The first party hereby grants and sells to, and confers upon the Southern Health Association an exclusive agency contract for the purpose of writing and selling hospitalization policies and contracts in Tarrant County, Texas, subject to the terms and conditions hereinafter set forth in this contract; and said first party further agrees that this contract shall remain in force for a period of five (5) years, and that during the life of this contract the privileges and benefits conferred upon the Southern Health Association by this contract shall not be granted to any other person or persons.

"II. In being granted this hospitalization agency contract, it is understood and agreed by and between the parties hereto that such hospitalization covers and includes the writing of contracts and insurance policies whereby the persons receiving a hospitalization policy or contract has the right to enter and receive hospital benefits and hospital care and attention, and hospital facilities in Methodist Hospital in Fort Worth, located in the City of Fort Worth, Tarrant County, Texas; and the Methodist Hospital in Fort Worth agrees that said Southern Health Association shall be its sole and exclusive agent for the purpose of soliciting, writing and issuing such policies and contracts.

"III. It is understood and agreed that all hospitalization contracts shall be issued by the Southern Health Association in the form of insurance policies approved by the Insurance Department at Austin, Texas; and that said policies when so written shall be assigned by the holder of said policy to the Methodist Hospital in Fort Worth, insofar as the hospitalization benefits set forth in said policy are concerned; and the first party agrees that when said policy has been so assigned, to fulfill, perform and provide all hospitalization benefits set forth and conferred upon the beneficiary named in said policy; all to be at the expense of said first party, except as otherwise provided for herein.

"IV. It is agreed and understood, however, that the Southern Health Association shall charge for each policy written covering hospitalization benefits, a certain rate agreed upon between the parties hereto; that until otherwise agreed upon, the rate for each hospitalization policy or contract shall be One Dollar ($1.00) per month per member, and that in no event shall the rate for each hospitalization policy or contract be less than seventy-five cents ($.75) per month; and that the Southern Health Association shall be entitled to receive the first month's premium and thirty-five (35) per cent of all additional premiums until the number of policies issued, written, and valid and outstanding, has reached the total sum of twenty-five hundred (2500); and thereafter until twenty-five hundred (2500) additional policies are written, and are valid and outstanding, and in full force and effect, the Southern Health Association shall be entitled to receive the first month's premium and thirty

(30) per cent of all additional premiums. If the membership holding hospitalization contracts or policies is increased beyond five thousand (5000) members, the Southern Health Association shall be entitled to receive the first month's premium and twenty-five (25) per cent of all additional premiums over the total premiums that might be paid in by any five thousand (5000) members whose policies and contracts are in good standing. The preceding schedule allowed to the Southern Health Association shall apply to all new business that may be written and any member who might be written who has held a former policy with the Southern Health Association shall be considered a new member, and the writing of such policy shall be deemed new business, provided the former policy has been lapsed for any period longer than thirty (30) days. The Southern Health Association shall not be entitled to receive the first month's premium on any members who voluntarily, without individual solicitation take out policies with the Southern Health Association under the terms of this contract, who prior to date hereof have been members in good standing with the Terrell Hospitalization Plan, in Tarrant County, Texas.

"V. It is agreed that all premiums received in payment of hospitalization policies or contracts shall be deposited in a bank agreed upon by the parties hereto in the city of Fort Worth, Texas, and that all checks written against said account shall be signed by both parties to this contract, or by such agents as may be designated by both parties hereto. It is further agreed that all selling expense shall be paid for by the Southern Health Association and the Methodist Hospital in Fort Worth shall be liable for no part thereof. All fees due the State of Texas for operating under an insurance charter shall be paid for by the Southern Health Association. The Southern Health Association agrees to keep a set of books governing all transactions relating to this contract, including a list of all policy holders and amounts and sums of all money collected, for examination by the first party at any time; and agrees to furnish a statement covering any matter inquired about by the first party upon five (5) days notice in writing; and otherwise, unless so requested, in writing, a statement of the receipts and disbursements shall be furnished monthly.

"VI. It is agreed by and between the parties hereto that the members sold hospitalization policies and contracts may be placed in a single group and that if any different policies are issued to some members than are issued to others, each group holding the same kind of policy may be classified by the Southern Health Association as a separate group or unit; and it is agreed by the party of the first part hereto that when it has been paid all the premium income from any group or class or unit, save and except the amounts allowed according to the schedule outlined above, that the Southern Health Association will be released from any and all claims by virtue of any obligation it may have assumed to pay for hospitalization privileges and benefits set forth in any policy issued by it under the terms of this agreement. It is further agreed that in the event the Southern Health Association is forced to return any unearned premium that the first party will bear its proportionate part thereof. It is also understood and agreed that the first party will cooperate and assist, and lend its efforts whenever necessary for the purpose of promoting sales, and in building up and increasing the number of persons carrying and taking out and paying for hospitalization contracts. It is also understood and agreed that the Southern Health Association will maintain an active organization, engaged in the promotion of sales for the purpose of enlarging the group of members as far as possible, during the full duration of this contract. It is further agreed that the Southern Health Association shall have in good standing a minimum of four thousand (4000) members within two and one-half (2½) years from the date of this contract, and shall have in good standing a minimum of five thousand (5000) members within five (5) years from the date of this contract. It is further provided that at the end of the term for which this contract extends, the Southern Health Association, provided it has complied with all the terms of this contract, shall have the privilege of extending the same for an additional time equal to the primary term hereof. In the event this contract is extended for an additional five (5) years, the Southern Health Association agrees to have in good standing a minimum of six thousand, two hundred and fifty (6250) members within two and one-half (2½) years from the date of extension hereof, and agrees to have in good standing a minimum of seven

172

thousand, five hundred (7500) members within five (5) years from the date of extension hereof, provided the facilities of the Methodist Hospital in Fort Worth are sufficient and available to accommodate the additional number of members. Twenty-five (25) private, or semi-private (two or three beds) rooms shall be deemed sufficient to accommodate each one thousand (1000) members.

"VII. It is further understood and agreed that the Southern Health Association shall have the right to employ such numbers of agents or sub-agents as it may deem necessary and proper for the purpose of promoting sales of hospitalization policies and otherwise performing the duties assumed by the Southern Health Association in this contract.

"VIII. It is further understood and agreed that any and all hospitalization benefits and privileges granted in any policy or contract issued by the Southern Health Association must be approved by the first party, and it is further understood and agreed that both parties hereto acknowledge that all the provisions, terms and covenants contained in this contract are subject to the valid rules and regulations of the Insurance Department of the State of Texas.

"IX. Party of the first part shall have the right at any time to cancel this contract for cause, upon thirty (30) days notice in writing to the Southern Health Association. It shall be deemed adequate cause for cancellation if the Southern Health Association fails to fulfill any of the membership quotas provided for in this contract at the times specified therefor, or if any other material covenant in this contract is violated by the said Southern Health Association.

"In witness whereof, the said parties have set their hands in the city of Fort Worth, Tarrant County, Texas, this the 4th day of June, A.D. 1937.
"Methodist Hospital in Fort Worth
"By (Signed)   Charles H. Harris
"First Party.
"Southern Health Association
"By (Signed)   C. A. Penniman, Pres.
"Second Party."

Some time after this contract was entered into the Insurance Commissioner of the State of Texas advised the interested parties that the insurance contracts could not lawfully be written restricting the policy holders to hospital service in the Methodist Hospital and advising that policy holders should be given the contractual right to select any hospital they may choose. Acting upon such advice, the policies were thereafter written to comply with such ruling. The record fails to show exactly when this occurred.

On March 27, 1941, the chairman of the Governing Board of said Hospital wrote the Health Association the following letter:
"Southern Health
    Association          March 27, 1941
"Harris Memorial Methodist Hospital
"Fort Worth, Texas
        "Attention:  C. A. Penniman,
                "President.
"Gentlemen:
"This is to advise you that after due consideration and investigation, I have been instructed by the Governing Board of the Harris Memorial Methodist Hospital to advise you that we will no longer consider ourselves bound by a contract dated as of the 4th day of June, A.D. 1937, by and between Southern Health Association, Party of the Second Part, and Harris Memorial Methodist Hospital, which succeeded Methodist Hospital in Fort Worth, as Party of the First Part, as we have been informed by competent legal counsel that this contract became void when the Board of Insurance Commissioners, acting through its duly authorized agent, adopted a ruling that your contracts must be good at any hospital, which ruling succeeded and superseded the provisions of the contract entered into by and between the parties set forth in this letter. Also, Party of the Second Part, Southern Health Association, has failed to carry out the terms and provisions as set forth in the contract, in that under Paragraph 6 of the said contract, it is provided that the Southern Health Association shall have in good standing a minimum of four thousand members within two and one-half years from the date of this contract. This provision has been violated, in that your present membership is under four thousand. It is also provided, in said contract, under Section 5, that the Southern Health Association agrees to keep a set of books governing all transactions relating to this contract, including a list of all policy-holders and amounts and sums of money collected for examination by First Party at any time, and agrees to furnish a statement

concerning any matter inquired about by First Party, upon five days notice in writing, and otherwise, unless so requested in writing, a statement of the receipts and disbursements shall be furnished monthly. This provision has been violated on numerous occasions, as your file will reflect, copies of said letters having been retained in the files of the writer.

"Respectfully yours,
"(Signed) Chas. H. Harris
"Chas. H. Harris, M.D., Chairman
"Governing Board of Harris
Memorial Methodist Hospital."

This letter was answered as follows:

"April 28, 1941
"Governing Board, Executive Committee, Board of Trustees

"Harris Memorial Methodist Hospital
"Fort Worth, Texas
"Gentlemen:
"We wish to acknowledge receipt of your letter of Mar. 27, 1941, received by us Mar. 29, 1941.

"We regret that we cannot accept cancellation of our contract with you, entered into June 4th, 1937, for cause, as we hold we have violated none of its provisions.

"However, it will be agreeable with us to terminate said contract, effective April 30, 1941, upon the following conditions:

"1. We shall retain our offices as at present in the Hospital, for a period of 60 days, from Apr. 30, 1941, for the purpose of completing plans relating to internal matters of the Association, and arrangements in connection with its future operation.

"2. The Hospital, or any person connected with it, commits no act, public or private, that will cause the Association any loss or damage during said 60 day period.

"3. A financial statement of accounts between the Hospital and the Association shall be prepared during said 60 day period, and furnished to the Hospital as soon as possible.

"We trust this plan will be acceptable to you, as it is our desire to relieve you of any future liability under the contract, and to arrive at a satisfactory settlement of all matters between the Hospital and the Association, with a view of causing no unfavorable reaction of the public toward the Hospital.

"Very truly yours,
"Southern Health Association,
"By        President."

The Hospital brought suit against the Health Association and alleged that the defendant had theretofore issued to some 102 persons who had received hospitalization at the hands of the plaintiff, when the insurance contracts were in force, and alleged that the several charges made, totaling $5,546.59, were reasonable.

It likewise alleged that the named policy holders "assigned to plaintiff the amount due from defendant to each of them under their respective policies * * * and that plaintiff is now the owner and holder of all rights of the original policy holders under said policies in and to said funds"; that demand had been made of defendant and payment had been refused.

In a second count and in the alternative plaintiff alleged that on June 4, 1937, the parties entered into the contract which was pleaded by the defendant and made a part of its answer and that "under the terms of such contract, after payment to defendant of the first month's premiums on all policies written under the terms thereof, it was agreed that the premiums on all policies so written would be divided on a basis of 65% to plaintiff and 35% to the defendant". It is then alleged that defendant has collected a sum in excess of $81,026.05 as premiums and has failed to account to plaintiff for its 65% of all such sums, and it sues for $10,000 as its "just share of the premiums so collected under the terms of said contract".

Defendant answered the amended petition and denied both generally and specifically the allegations of the amended petition, and pleaded the contract made by the parties on June 4, 1937, made same an exhibit to the answer (being the same contract pleaded by plaintiff in its second and alternative count) and alleged that it had fully performed its duties under the contract and that it was not indebted to plaintiff in any sum.

It is pertinent to here observe that the plaintiff urged two special exceptions to paragraphs 14 and 15 of the defendant's answer, wherein the contract of June 4, 1937, was specially pleaded, and that the exceptions charge that the contract is illegal and void because it violates the Anti-Trust laws of Texas (Article 7426 of the Civil Statutes and Article 1632 of the Penal Code).

From the record it appears that the cause proceeded to trial as if no such ex-

ceptions were raised, and that, after the case had been developed, the contract introduced in evidence and testimony and evidence introduced concerning the execution of the contract and what was done thereafter, and when the court prepared his judgment, it declares that the two exceptions to paragraphs 14 and 15 of the defendant's answer were sustained and that defendant excepted to the ruling then made.

The record discloses that the trial court considered the written contract (dated June 4, 1937) after it was introduced in evidence and testimony adduced to show what, if anything, the parties to it did, after its execution, and not when it was presented to the trial court as a part of the defendant's pleadings, and it appears that the trial court made a number of findings concerning it.

Among such it was found that the parties made the written contract; that defendant pleaded it in defense of the suit and relied upon it as a defense; that it was abandoned shortly after its execution; that it was definitely terminated on April 30, 1941, by the plaintiff; that in keeping with the terms of such written contract, the defendant paid the plaintiff money in excess of that provided for in the contract; that from June 4, 1937, to April 30, 1941, defendant fulfilled all of its obligations under the provisions of such written contract; that the plaintiff did not fail to cooperate with the defendant under the terms of the written contract. That the contract is void and illegal.

The trial court also finds that the dealings had by and between plaintiff and defendant "were done in pursuant (pursuance?) of a voluntary course adopted by the plaintiff and the defendant subsequent to the abandonment of the contract of June 4, 1937"; and there are other findings to the effect that the dealings between the parties were carried out in the manner contemplated and provided for in the written contract; and then finds that certain of these things when done "were not done for the purpose of carrying into effect the enterprise covered by the contract of June 4, 1937".

The court found that the plaintiff's rights under the several insurance policies were had solely by virtue of the assignment of the policies to the plaintiff, and then specifically found "that the evidence does not disclose that the policy holder uttered any words expressly transferring the benefits of any insurance policy to the hospital"; and that no written assignment of any policy was made by the policy holder to the hospital.

The court found that each of the policies sued upon were stamped with a rubber stamp as follows: "The policyholder agrees that the benefits payable under this policy have been assigned by the policyholder to the Methodist Hospital in Fort Worth, and such assignment has been accepted by the Southern Health Association, and the Methodist Hospital in Fort Worth agrees to render the service as provided for in this policy." The trial court made no finding relative to who stamped the foregoing words on the policies, but found that plaintiff and defendant caused the same to be stamped upon the policies, and the testimony shows that this stamp was put upon all policies even those in which hospitalization was furnished by other hospitals. The court then finds that all of the policies sued upon were delivered by each beneficiary to the Hospital and that defendant had actual knowledge of such delivery and acceptance of each policy and had actual knowledge that the provisions of the assignment were stamped on each policy.

The trial court rendered judgment against the defendant on the first count in the petition, and it appearing that the plaintiff having notified the Insurance Commissioner of Texas that the defendant owed it for the hospitalization services sued for, and that the defendant Insurance organization was then attempting to sell its business to another Insurance organization of like kind, and that the Insurance Commissioner had required the defendant to put up the sum of $5,000 in a bank in Dallas, Texas, to secure the proposed purchaser against loss occasioned by the plaintiff's claims, the trial court found that such sum was "available for the payment of any judgment rendered" in the instant suit and promptly rendered judgment as follows: "It is the further order of the court that the sum of approximately Five Thousand Dollars ($5000) on deposit with the Dallas National Bank in the City of Dallas, Dallas County, Texas, in the name of Southern Health Association, be, and the same is hereby adjudged to be subject to the payment of this judgment."

Appealing from the judgment the defendant presents eight points.

The first point contends that it was error on the part of the trial court to hold that the written contract dated June 4, 1937, is illegal and to award one of the parties a judgment where it was shown that the course of dealing between the parties in the illegal transaction was a necessary part of plaintiff's case; such course of dealing in the illegal transaction being so closely interwoven that it cannot be wholly separated from the plaintiff's case, and the parties, therefore, being in pari delicto.

We are unable to find evidence to support the theory that the contract of June 4, 1937, was abandoned by the parties thereto.

All of the evidence tends to show that the parties operated under the terms and provisions ·of the contract, and that the contract was carried out by the parties as entered into, with the exception that all policy holders were given the right to select any hospital they or any of them might choose.

As we view the record, the original contract was merely modified by the parties, and was not abandoned. All of their dealings so indicate.

No other conclusion can be reached from the facts and circumstances surrounding the dealings of the parties.

The record before us shows that the funds collected from premiums were placed in the Fort Worth National Bank in the name of Southern Health Association as the depositor and that these funds were drawn out only by checks signed by Southern Health Association by its president and secretary and countersigned by the Hospital by the manager thereof. Not one dollar of such funds was ever paid out during all of the dealings between the parties to this suit except in such manner, and every dollar paid to and received by the Hospital was paid in this manner.

All of this was in keeping with the very provisions of the original contract.

And it affirmatively appears that of these premiums collected only 35% was set apart to and for the operating expenses of the Health Association and 65% was set apart to pay the hospitalization expenses, and that all such funds were paid out by checks ·with the joint signatures of the parties on same, as aforesaid.

All this was in keeping with the very terms of the original contract.

We give these facts as a mere sample of the evidence that shows how the parties carried out every provision of the original contract except the requirement that all policy holders be required to go to the Methodist Hospital for hospitalization.

We reiterate, the evidence does not support the finding that the original contract was abandoned.

We do not believe that the plaintiff can recover in this suit without establishing the contract which it attacks as illegal and in violation of the Anti-Trust laws of Texas, unless it can be established that plaintiff is suing solely as assignee of the several contracts, and this brings us to the second point in the brief: "It was error to hold the plaintiff hospital was the assignee of the 102 individual policy holders where the trial court found specially that no policy holder executed a written or oral assignment, and excluded from the trial any evidence tending to show liability on the defendant in the absence of an assignment."

We gather from appellee's brief that it has rested its case on some character of equitable assignment.

We believe the finding by the trial court that no policy holder executed either a written or an oral assignment of his policy to the plaintiff hospital is absolutely correct and supported by the record. We fail to find any pleading on the part of the plaintiff to lay a predicate for some character of equitable assignment.

It appears from the record that, the cause being tried to the court, the court permitted the written contract to be introduced in evidence, and testimony concerning the acts of the parties which tended to show that the parties so conducted themselves that they were actually carrying out the provisions of the contract, with the sole exception that the policies were not so written as to require the policy holders to go to the Methodist Hospital for hospitalization, and reserved the right to either consider or exclude the evidence, in the event the court sustained the objections made to the admissibility of the contract in evidence, and of the testimony and evidence showing that the parties operated under the contract.

Beginning at page 286 of the Statement of Facts, when C. A. Penniman, President ·of the defendant insurance company, was on the witness stand for the defendant, we

find the following in the record: "Q. Mr. Penniman, I hand you here a contract which is dated June 4, 1937, purporting to bear the signature of the Methodist Hospital in Fort Worth, by Chas. H. Harris, and the Southern Health Association by C. A. Penniman, president, and I will ask you to examine that instrument and tell us what it is."

To this counsel for plaintiff interposed the following objections: "At this time, we renew our objection and our exceptions that we have set out in the pleadings relative to this contract being illegal, and of no force and effect, and for the reasons that have been stated before, and I object to any question or any interrogation relative to this particular contract."

The court then ruled as follows: "I believe that I will sustain the objection for the present, Mr. Scott (who is counsel for defendant), and we will get to that later. You may go ahead for your bill and introduce it in evidence, and if I overrule the objection, why, you will have it for your bill, and if I sustain it, you will have it for your bill."

All through the Statement of Facts similar situations are shown with reference to the testimony and evidence that was sought to be introduced by the defendant showing that the terms and provisions of the written contract were carried out between the parties, saving and except that portion which required the policy holders to go to the Methodist Hospital, and the court heard the evidence and testimony at least for the purpose of bills of exception.

Some testimony tending to show that the parties carried out the terms of the contract was introduced, apparently without objection, but in fairness to the trial court and all interested parties, we are of opinion that the trial court heard all such testimony with the reservation made by him and with the understanding that it should go into the record at least for the purpose of bills of exception.

But the fact remains, and the record affirmatively shows, that the trial court considered the evidence because he made many findings that have no support in the evidence other than that predicated upon the contract and what was done by the parties in keeping with the very terms of the contract.

We think the trial court fell into error in this: It is our opinion that this written contract is admissible in evidence, and that any and all evidence and testimony tending to show that the parties operated under it, in whole or in part, and that tending to show that its terms were carried out by the parties, in whole or in part, is likewise admissible in evidence.

This is to us a sound statement of the law because under such authorities as Vol. 6, R.C.L. pp. 820, 821 and 826, in Sections or Paragraphs 216, 217 and 220, we find the rule stated that if a contract grows immediately out of or is connected with an illegal contract, a court cannot lend its aid to enforce it; and that if the connection between an original illegal transaction and a new promise can be traced, if the last named promise is connected with and grows out of the original illegal transaction, it cannot form the basis of a recovery; and that the true test is whether the contract sought to be enforced can be separated from the illegal contract, and whether the plaintiff requires any aid from or must in any way rely upon the illegal transaction in order to establish his case.

Potter County v. C. C. Slaughter Cattle Co., Tex.Com.App., 254 S.W. 775, and cases cited.

Among the findings of fact made by the trial court it was found (Trans. p. 69): "The Hospital did hold itself out to the public as controlling and supervising the hospitalization insurance business of the defendant, both prior to and subsequent to the abandonment of the contract of June 4, 1937."

The finding that the original contract was abandoned has no support in the evidence, as we view this record.

■ We believe that the original contract made by the parties violates the Anti-Trust laws of Texas, but we are of opinion that the judgment in this cause should not stand, in the light of this record, and that the cause should be remanded for a new trial.

■ The judgment of the trial court touching the monies on deposit in a Special Account in the Dallas bank is not definite and clear. The trial court did not give the plaintiff judgment for such monies, and we do not believe that the court is authorized to enter any such judgment, even if the plaintiff recovers, under the present pleadings and with the present parties only parties to the suit.

As the record now stands, it occurs to us that if the plaintiff may recover, its reme-

dy against such funds would be by and through a writ of garnishment after judgment.

█ In the light of the case as it appears in the record now before us, the plaintiff may recover only by establishing that the original contract was abandoned by all parties thereto, or by being able to show a right to recover by showing some other contract between the parties that did not grow immediately out of, or that is connected with the illegal contract first entered into.

We believe the evidence ample to support the findings that proofs of losses were never required in the dealings between the parties, and that these were in effect waived, and that the policies sued upon were in force.

█ We are inclined to believe that the trial court was within his rights, under the circumstances of this case, in considering the records of the Hospital in determining whether or not these 102 policy holders were entitled to services under their respective policies.

We feel no necessity in discussing all of the points raised, and, for the reasons given, the judgment is reversed and the cause remanded.

McDONALD, C. J., not sitting.