OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS

December 27, 2001

The Honorable Patrick B. Haggerty
Chair, House Corrections Committee
Texas House of Representatives
P. O. Box 2910
Austin, Texas 78768-2910

Opinion No. JC-0447

Re: Whether a hospital may contract exclusively
with a single medical insurance provider
(RQ-0407-JC)

Dear Representative Haggerty:

You ask about the authority of a hospital to enter into an "exclusive" point-of-service, member hospital contract with a group hospital corporation.[1] We understand that you are concerned that such a contract violates the Texas Free Enterprise and Antitrust Act of 1983. See TEX. BUS. & COM. CODE ANN. §§ 15.01-.52 (Vernon 1987 & Supp. 2002) (the "Act").[2] Generally, it is beyond the purview of the opinion process to construe particular contracts and investigate or make findings of fact. Even assuming that the contract in question is an "exclusive" contract, we cannot provide a definitive response. Exclusive dealing arrangements do not, as a matter of law, violate the Act. Whether a particular exclusive contract violates the Act depends on whether it has an actual adverse effect on competition in the relevant market by foreclosing competition in a substantial share of that market.

By way of background, a point-of-service health benefit plan is similar to a preferred provider health benefit plan.[3] A fundamental feature of such a managed care plan is that health care coverage is offered through a network of health care providers that contract with the health plan or insurer. See ERS Letter, supra note 3, at 2. The contracts are negotiated to enable the health plan or insurer to obtain the lowest possible health care service rates from the network health providers for the individuals covered by the plan, and the provider a guaranteed volume of business from the plan's participants. See id.

---

[1]See Letter from Honorable Patrick B. Haggerty, Chair, House Corrections Committee, Texas House of Representatives, to Honorable John Cornyn, Texas Attorney General (July 26, 2001) [hereinafter Request Letter] and attached "dictation" from Lawrence P. Boyle, M.D. (July 18, 2001) (on file with Opinion Committee) [hereinafter Dr. Boyle Dictation].

[2]You do not indicate the laws that the particular contract violates. See generally Request Letter, supra note 1. However, the dictation from Lawrence P. Boyle, M.D., states that the contract "might involve federal antitrust legislation or perhaps State Attorney General legislation." See Dr. Boyle Dictation, supra note 1, at 4.

[3]See Letter from Paula A. Jones, General Counsel, Employees Retirement System of Texas, to Honorable John Cornyn, Texas Attorney General (Oct. 3, 2001) (on file with Opinion Committee) [hereinafter ERS Letter].

The specific contract giving rise to your request is the "Member Hospital Contract (Point of Service (POS) Program)" between Huntsville Memorial Hospital, a private Texas nonprofit corporation ("Memorial Hospital"), and Blue Cross and Blue Shield of Texas, Inc., a Texas group hospital corporation (BCBSTX).[4] Under the Contract, in exchange for an agreed reimbursement rate, Memorial Hospital has contracted to provide certain health care services to subscribers of BCBSTX or BCBSTX-affiliated health plans. *See* Memorial Hospital Brief, *supra* note 4, at 5.[5] These services are provided at the facility also known as the Huntsville Memorial Hospital (the "Hospital Facility"), which Memorial Hospital leases from the Walker County Hospital District (the "Hospital District"). *See* Memorial Hospital Brief, *supra* note 4, at 4. The Hospital District is not a party to the Contract. *See* Contract, *supra* note 4, at 1. In 1998, Memorial Hospital and BCBSTX amended the Contract to provide that the Hospital Facility would be the only facility in Walker County under contract with BCBSTX for the provision of ambulatory surgery services and that BCBSTX would not contract with another ambulatory surgery center in the county without the written consent of Memorial Hospital. *See* Memorial Hospital Brief, *supra* note 4, at 5; Huntsville Surgery Brief, *supra* note 5, at 1-2. In 2001, the parties again amended the Contract to provide that the Hospital Facility would be the only facility in Walker County under contract with BCBSTX for the provision of medical imaging services, specifically magnetic resonance imaging ("MRI") and computer tomography ("CT") scans for two years. *See* Memorial Hospital Brief, *supra* note 4, at 5; Huntsville Surgery Brief, *supra* note 5, at 2. In return, Memorial Hospital further decreased its hospital service fees, resulting in additional savings to BCBSTX. *See* Huntsville Surgery Brief, *supra* note 5, at 2. The significance of the Contract and the two amendments is that services at the Hospital Facility are compensated by BCBSTX at "in-network" or higher rates; services offered by other medical providers in Walker County are compensated by BCBSTX at "out-of-network" or lower rates. *See* Memorial Hospital Brief, *supra* note 4, at 5; Huntsville Surgery Brief, *supra* note 5, at 3.

Huntsville Surgery Center, a private outpatient surgery center ("Huntsville Surgery"), contends that because the Contract prevents Huntsville Surgery from becoming an "in-network" provider, the Contract is an "exclusive" contract that by "its very nature" violates the Texas Free Enterprise and Antitrust Act. *See* Huntsville Surgery Brief, *supra* note 5, at 4, 5, 10. Huntsville Surgery does not contend that Memorial Hospital is a public hospital. *See id., supra* note 5, at 4. Nor is Huntsville Surgery concerned with the latter's status as a private or public entity, "but rather [with] the exclusivity of [the] preferred provider arrangement." *Id., supra* note 5, at 4. Memorial Hospital disputes, first, that the Contract is exclusive, and second, even assuming that it is exclusive, that it violates the Act. *See* Memorial Hospital Brief, *supra* note 4, at 9.

---

[4]*See* "Member Hospital Contract (Point of Service (POS) Program)" at 1 [hereinafter Contract], attached at subdivision "J" to Brief submitted on behalf of Huntsville Memorial Hospital, from Michael L. Spain, Fulbright & Jaworski, L.L.P. (Oct. 2, 2001) (on file with Opinion Committee) [hereinafter Memorial Hospital Brief].

[5]*See also* Brief submitted on behalf of Huntsville Surgery Center, from Jerry W. Baker, Fairchild, Price, Thomas, Haley & Willingham, L.L.P. (Oct. 2, 2001) (on file with Opinion Committee) [hereinafter Huntsville Surgery Brief].

Generally, it is beyond the purview of the opinion process to construe contracts or scrutinize particular contractual arrangements, especially those between private entities, and to determine whether they satisfy specific statutory requirements or are otherwise legally permissible.[6] Additionally, this office does not undertake investigations or make findings of facts in the opinion process.[7] Accordingly, even assuming here that public interests rather than private interests are affected by the Contract and assuming that it is an "exclusive" contract, we cannot determine whether it violates the Act. Such a determination requires investigation, presentation, and weighing of factual data regarding the adverse effects of the Contract in the "relevant market" that is clearly beyond the purview of an attorney general opinion. While we cannot provide a definitive response to your question, we provide the general legal criteria for assessing whether an exclusive contract violates the Act with the following caveat: It is beyond the scope of an attorney general opinion to provide an exhaustive treatment of antitrust law, and we do not purport to do so here.

The Act's stated purpose is to "maintain and promote economic competition in trade and commerce . . . and to provide the benefits of that competition to consumers in the state." TEX. BUS. & COM. CODE ANN. § 15.04 (Vernon 1987); *see also Caller-Times Publ'g Co. v. Triad Communications*, 826 S.W.2d 576, 581 (Tex. 1992) (Act's purpose is to protect competition and not individual competitors). The legislature adopted the Act in 1983 as a "sweeping reform of the former Texas antitrust act originally passed in 1889, one year before Congress passed the Sherman Antitrust Act," and "to update Texas antitrust law and afford courts broader powers of protection than that provided by the 'laundry list' of particular violations set out in" the earlier law. *Caller-Times*, 826 S.W.2d at 579-80. It is modeled on both the federal Sherman Antitrust Act and the Clayton Act. *See id.* at 580. Consistent with its foundation in federal law, section 15.04 of the Act provides that it is to be interpreted in harmony with federal judicial interpretations of comparable federal law. *See* TEX. BUS. & COM. CODE ANN. § 15.04 (Vernon 1987); *Caller-Times*, 826 S.W.2d at 580. This provision gives the Texas Supreme Court "wide latitude in developing an appropriate test" when the United States Supreme Court has not developed a test for a particular type of antitrust violation. *See id.* at 580-81. Significantly, the Texas Supreme Court is not bound by the decisions of the Fifth Circuit when there is no United States Supreme Court precedent. *See id.*

Huntsville Surgery's contention, as we understand it, is that the Contract unlawfully restrains trade or creates a monopoly in violation of sections 15.05(a) and 15.05(b) of the Act. *See* Huntsville Surgery Brief, *supra* note 5, at 5. Those subsections provide as follows:

> (a)  Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful.

---

[6]*See* Tex. Att'y Gen. LO-94-001, at 2.

[7]*See, e.g.,* Tex. Att'y Gen. Op. Nos. JC-0032 (1999) at 4; JC-0027 (1999) at 3; JC-0020 (1999) at 2.

> (b) It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce.

*Id.* § 15.05(a), (b) (Vernon Supp. 2002). We consider each subsection in turn.

Subsection (a), making contracts that restrain trade unlawful, is comparable to and taken from section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990). Not every contract in restraint of trade is unlawful under section 1 of the Sherman Antitrust Act, but only those contracts that unreasonably restrain trade, *i.e.*, those that fail the "rule of reason" test. *See DeSantis*, 793 S.W.2d at 687 (citing *Standard Oil Co. v. United States*, 221 U.S. 1 (1911) and *United States v. Am. Tobacco Co.*, 221 U.S. 106 (1911)). The focus of the "rule of reason" test is whether the restraint promotes or suppresses competition. *See id.* (citing *Chicago Bd. of Trade v. United States*, 246 U.S. 231 (1918) and *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977)).

Some restraints on trade have an inherently pernicious effect upon competition and are "per se" unreasonable. *See Cont'l T.V.*, 433 U.S. at 36-37 (1977); *see also Jefferson Parish Hosp. Dist. v. Hyde*, 466 U.S. 2, 9 (1984) ("A price fixing agreement between competitors is the classic example of [a 'per se' unreasonable] arrangement."). Under the "per se" rule, a restraint on trade that seldom serves any purpose other than to restrain competition is illegal without proof of market power or anticompetitive effect. *See Jefferson Parish Hosp. Dist.* 466 U.S. at 33 (O'Connor, J., concurring). A price fixing agreement between competitors is an example of a "per se" illegal contract. *See id.* at 9. Agreements to refuse to deal with non-members of an association or to license a patented device on condition that unpatented materials be used in conjunction with the patented device are additional examples of "per se" illegality. *See id.* at 11, n.10.

Arrangements that are not "per se" unreasonable are analyzed using the "rule of reason" test. To establish a violation under the "rule of reason" test, it is necessary to prove that a contract has an actual adverse effect on competition in the relevant market, and establish the relevant market. *See DeSantis*, 793 S.W.2d at 688 (citing *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553 (11th Cir. 1983) and *Aydin Corp. v. Loral Corp.*, 718 F.2d 897 (9th Cir. 1983)); *see also Winston v. Am. Med. Int'l.*, 930 S.W.2d 945, 951-52 (Tex. App.–Houston [1st Dist] 1996, writ denied).

Exclusive dealing contracts generally are not "per se" violations of section 1 of the Sherman Antitrust Act. *See Jefferson Parish Hosp. Dist.*, 466 U.S. at 2 (upholding contract providing that all anesthesiologist services required at hospital would be provided by single anesthesiologist firm);[8]

---

[8] As Justice O'Connor explained in her concurring opinion:

(continued...)

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) (upholding contract requiring utility company to purchase all coal needed at generating plants from a single supplier); *Surgical Care Ctr. v. Hosp. Serv. Dist.*, No. CIV.A.97-1840, 2001 WL 8586 (E.D. La. Jan. 3, 2001) (upholding hospital contract with health maintenance organizations and preferred provider organizations designating hospital as sole health service provider in designated area in exchange for discounted charges); *Gonzalez v. San Jacinto Methodist Hosp.*, 880 S.W.2d 436 (Tex. App.–Texarkana 1994, writ denied) (concluding that hospital's exclusive contract for anesthesiologist services did not violate Act in absence of actual adverse effect on competition). In *Tampa Electric*, the United States Supreme Court explained that an exclusive dealing contract does not violate the antitrust laws "unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec.*, 365 U.S. at 327. This analysis requires consideration of the area of competition for the product or service — the relevant market — and a finding that "opportunities for other traders to enter into or remain in the market [are] significantly limited as was pointed out in *Standard Oil Co. v. United States, supra.*" *Id.* at 328. Similarly, in *Jefferson Parish Hospital District*, the Court stated that an exclusive contract does not violate section 1 of the Sherman Antitrust Act unless it unreasonably restrains competition. *See Jefferson Parish Hosp. Dist.*, 466 U.S. at 29. Moreover, "[w]ithout a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws . . . ." *Id.* at 31. Finally, in a concurring opinion in that case, four of the justices reiterated that exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of the market. *See id.* at 45 (O'Connor, J., concurring) (citing *Standard Oil Co. v. United States*, 337 U. S. 293 (1949)).

Even when it is alleged that an exclusive contract involves an illegal "tie" — a form of marketing in which a seller insists on selling two distinct products or services as a package — application of the "per se" rule is limited to situations where the seller has the market power to force purchase of a product or service that would not otherwise be purchased from the seller. *See id.* at 11-15; *see also San Jacinto Methodist Hosp.*, 880 S.W.2d at 441-42. Without evidence of this "forcing" market power, a "tying" is not illegal. *See Jefferson Parish Hosp. Dist.*, 466 U.S. at 16-19; *see also id.* at 34-35 (O'Connor, J., concurring) ("per se" doctrine in tying cases has always

---

[8](...continued)

> Exclusive dealing arrangements may, in some circumstances, create or extend market power of a supplier or the purchaser party to the exclusive dealing arrangement, and may thus restrain horizontal competition. Exclusive dealing can have adverse economic consequences [on consumers] by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods, or by allowing one buyer of goods unreasonably to deprive other buyers of a needed source of supply. In determining whether an exclusive dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question--the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others.

*Jefferson Parish Hosp. Dist. v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring).

required elaborate inquiry into economic effects of tying arrangement because Court has never been willing to say that arrangement is always illegal, without proof of market power or anticompetitive effect); *see also Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1382 (5th Cir. 1994) ("per se" illegality makes sense when describing price fixing or horizontal market division, but is confusing with respect to illegal tie because it requires market power analysis as predicate to "per se" illegality).

Because an exclusive dealing arrangement is generally not a "per se" violation of the antitrust laws, a particular exclusive contract, such as the Contract here, would be subject to the "rule of reason" test under section 15.05(a) of the Act: To constitute an unlawful restraint on trade, the Contract must have an actual adverse effect on competition in the relevant market by foreclosing competition in a substantial share of that market. To establish that the Contract restrains trade, Huntsville Surgery would be required to provide evidence of the Contract's actual adverse effects on competition in the relevant market — by foreclosing competition in a substantial share of that market — and establish the relevant market.

We next consider section 15.05(b), which is comparable to section 2 of the Sherman Antitrust Act: both make it unlawful for a person to monopolize or attempt to monopolize. *See Caller-Times*, 826 S.W.2d at 580. "Monopoly power is the power to control price or exclude competition." *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

An unlawful monopoly or attempted monopoly under section 15.05(b) requires a showing that an entity has through some anticompetitive act acquired or maintained monopoly power, such as to control price or exclude competition, or that there is a dangerous probability that it will acquire such monopoly power through some anticompetitive act. The elements necessary to establish a *completed* monopoly under these sections are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Caller-Times*, 826 S.W.2d at 580 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). With respect to the first element, an assessment of monopoly or market power requires a definition of the relevant market. *See Roy B. Taylor Sales*, 28 F.3d at 1386; *see also E.I. duPont*, 351 U.S. at 393 ("Illegal [monopoly] power must be appraised in terms of the competitive market for the product."). The relevant market is, in turn, defined by the product or service and the geographic area in which it is sold. *See Roy B. Taylor Sales*, 28 F.3d at 1386. Absent special circumstances, courts have generally required a market share higher than fifty percent of the relevant market to support a finding of monopoly. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984). The second element of completed monopoly requires a showing of some "predatory" or "anticompetitive" act. *See Caller-Times*, 826 S.W.2d at 580. Turning to *attempted* monopoly, the necessary elements are "(1) . . . predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Demonstrating the dangerous

probability of monopolization in an attempt case also requires an inquiry into the relevant product and geographic market and a defendant's economic power in that market. *See id.* at 459.

Huntsville Surgery does not elaborate on its contention that the Contract violates section 15.05(b). Presumably, the Contract is the anticompetitive act of which Huntsville Surgery complains. It is unclear, however, whether Huntsville Surgery believes that Memorial Hospital or BCBSTX has acquired or maintained an illegal monopoly or attempted such monopoly. In any case, to prove either an illegal monopoly or attempted monopoly, Hunstville Surgery would have to establish that Memorial Hospital or BCBSTX has the requisite market power in the relevant market.

Huntsville Surgery asserts that the Contract is unlawful, as a matter of law, under section 15.05(a) and (b) of the Act, relying on *Southern Health Ass'n v. Harris Memorial Methodist Hospital*, 180 S.W.2d 169 (Tex. Civ. App.–Fort Worth 1944, writ ref'd w.o.m.). *See* Huntsville Surgery Brief, *supra* note 5, at 7-8. Huntsville Surgery's reliance on this case as dispositive of the "per se" illegality of the Contract is misplaced. *See id.* In *Southern Health*, the court opined that an exclusive hospitalization agency contract between a hospital — Harris Memorial Methodist Hospital — and an insurance company restricting insured policy holders to hospital services at Methodist Hospital violated the state's antitrust laws. *See S. Health*, 180 S.W.2d at 176. As Huntsville Surgery acknowledges, this case was decided well before the prevalence of health maintenance organizations and preferred provider organizations. *See* Huntsville Surgery Brief, *supra* note 5, at 7. But more importantly, it was decided under the state's 1889 version of the antitrust laws, when Texas courts did not interpret its provisions consistently with federal antitrust law. *See Red Wing Shoe Co. v. Shearer's Inc.*, 769 S.W.2d 339, 342-43 (Tex. App.–Houston [1st Dist.] 1989, no writ) (holding that 1983 amendment to state antitrust laws overruled former law holding vertical nonprice restrictions illegal "per se"; such restraints subject to "rule of reason" analysis applied by federal courts and adopted by 1983 Act); *see also DeSantis*, 793 S.W.2d at 688 (post-employment noncompetition agreement does not violate section15.05(a) of Act unless it fails the same "rule of reason" analysis that would be applied under federal law). *Southern Health's* analysis does not reflect antitrust jurisprudence under the Act.

Additionally, Huntsville Surgery contends that the Contract is unlawful because BCBSTX did not follow the contracting procedures applicable to "Preferred Provider Benefit Plans" set out in section 3 of article 3.70-3C of the Insurance Code. *See* Huntsville Surgery Brief, *supra* note 5, at 9. Section 3 of article 3.70-3C provides as follows:

> (a) A health insurance policy that includes different benefits from the basic level of coverage for use of preferred providers shall not be considered unjust under Article 3.42 of this code, or unfair discrimination under Article 21.21-6, added by Chapter 415, Acts of the 74th Legislature, 1995, or Article 21.21-8 of this code or to violate Subsection (B), Section 2, Chapter 397, Act of the 54th Legislature, 1955 (Article 3.70-2, Vernon's Texas Insurance Code),

or Article 21.52 of this code, if it meets the requirements of this section.

(b) (1) Physicians, practitioners, institutional providers, and health care providers other than physicians, practitioners, and institutional providers, if such other health care providers are included by the insurer as preferred providers, licensed to treat injuries or illnesses or to provide services covered by the health insurance policy that comply with the terms and conditions established by the insurer for designation as preferred providers *may apply for and shall be afforded a fair, reasonable, and equivalent opportunity to become preferred providers. Such designation shall not be unreasonably withheld.*

(2) *If a designation as a preferred provider is withheld relating to a physician or practitioner, the insurer shall provide a reasonable review mechanism that incorporates, in an advisory role only, a review panel.* Any recommendation of the panel shall be provided on request to the affected physician or practitioner. In the event of an insurer determination contrary to any recommendation of the panel, *a written explanation of the insurer's determination shall also be provided on request to the affected physician or practitioner.*

. . . .

(4) The insurer must give a physician or health care provider not designated on initial application written reasons for denial of the designation; *however, unless otherwise limited by this code, this section does not prohibit an insurer from rejecting an application from a physician or health care provider based on a determination that the preferred provider benefit plan has sufficient qualified providers.*

(c) *Any insurer, when sponsoring a preferred provider benefit plan, shall immediately notify, by publication or in writing to each physician and practitioner, all physicians and practitioners in the geographic area covered by the plan of its intent to offer such a plan and of the opportunity to participate. Such notice and opportunity shall be provided on a yearly basis thereafter* to noncontracting physicians and practitioners in the geographic area covered by the plan. The insurer shall on request make available to any physician or health care provider information concerning the application process

> and qualification requirements for participation as a provider in the plan.
>
> . . . .

TEX. INS. CODE ANN. art. 3.70-3C § 3(a), (b), (c) (Vernon Supp. 2002) (emphasis added).

Huntsville Surgery specifically alleges that (1) it was not provided the opportunity to participate in the preferred provider benefit plan; (2) it has been unable to apply for participation; (3) no review panel has been employed to review the withholding of the preferred provider status; (4) BCBSTX has not given any reasons for denial of the designation; and (5) Huntsville Surgery's "designation as a preferred provider has been unreasonably withheld, and this withholding is solely due to the exclusive contract between" Memorial Hospital and BCBSTX. *See* Huntsville Surgery Brief, *supra* note 5, at 10.

While an insurer must follow the procedures set out in article 3.70-3C, section 3 in contracting with preferred health providers to the extent applicable,[9] a health care provider is not entitled to a designation as a preferred provider. The statute only requires that the designation "shall not be unreasonably withheld." TEX. INS. CODE ANN. art. 3.70-3C § 3(b)(1) (Vernon Supp. 2002). An insurer may reject a health care provider's application for preferred provider designation based on a determination that the preferred provider benefit plan has sufficient qualified providers. *See id.* § 3(b)(4). Withholding a preferred provider designation based on such a determination is statutorily "reasonable." *See id.* § 3(b)(1), (4).

If BCBSTX has determined that its Contract with Memorial Hospital provides sufficient "qualified providers" in the geographic area, nothing in the statute requires that it nonetheless contract with another health provider. *See id.* § 3 (b)(4). Whether BCBSTX's determination is unreasonable — which appears to be the essence of Huntsville Surgery's contentions — involves questions of fact. Similarly, determining whether BCBSTX's failure to comply with the procedural requirements of the statute, assuming the truth of Huntsville Surgery's assertions, is fatal in light of BCBSTX's contractual obligation with Memorial Hospital also involves questions of fact. In any case, the Texas Department of Insurance is the appropriate entity, in the first instance, to investigate and determine whether BCBSTX has violated section 3 of article 3.70-3C. *See* TEX. INS. CODE ANN. § 31.002 (Vernon 2002) (Texas Department of Insurance shall regulate the business of insurance and ensure that the Insurance Code and other laws regarding insurance are executed.).

---

[9]Memorial Hospital argues that because Huntsville Surgery is not a "physician" or a "practitioner," BCBSTX is not required to give notice and opportunity to participate on an annual basis under section 3(c) or provide a "review panel" under section 3(b)(2). *See* Supplemental Brief submitted on behalf of Huntsville Memorial Hospital, from Michael L. Spain, Fulbright & Jaworski, L.L.P., at 2-4 (Oct. 22, 2001) (on file with Opinion Committee).

## S U M M A R Y

Whether a particular exclusive contract between a public or private hospital and a medical insurance provider violates the Texas Free Enterprise and Antitrust Act of 1983 depends on whether it has an actual adverse effect on competition in the relevant market by foreclosing competition in a substantial share of that market. Exclusive dealing arrangements do not, as a matter of law, violate the Act.

Very truly yours,

JOHN CORNYN
Attorney General of Texas

HOWARD G. BALDWIN, JR.
First Assistant Attorney General

NANCY FULLER
Deputy Attorney General - General Counsel

SUSAN D. GUSKY
Chair, Opinion Committee

Sheela Rai
Assistant Attorney General, Opinion Committee